The opinion of the Court was delivered by
Mr. Justice Cheves.
In this case it is necessary to state what are the grounds of this motion, for they are stated so generally in the brief and notice, as not to present the nature of them distinctly.
The grounds are, 1st, That the presiding J udge misdirected the Jury, in charging them that there was no sufficient evidence on which to presume the payment of the note by Kirkpatrick, and also in charging them, that although the statute of *271 limitations had commenced its operation before r the insanity of the payee, its operation ceased on the occurrence oí that event. '
2d. That the evidence authorized the pre---sumption of payment.
3d. That the statute having commenced its operation, was not suspended by the supervening disability of the payee.
1st. The presiding Judge did no more than state to the Jury the impression of his mind, as to the presumption of payment; and it is the duty of a Judge to do so, when he thinks the nature of the Case requires it, and then fairly submitted the , question to them for their decision. In this there could be no misdirection. The correctness, or incorrectness of his charge, on the plea of the statute, will be considered when we come to that point. If the law be otherwise, the verdict would be,. of course, set aside, though he had. charged differently. On this point, therefore, the charge of the Judge is immaterial,
2d. On the evidence of the presumption of payment I concur, from the view which I am enabled to take of the testimony, with the presiding Judge; but if I did not, it was a question of fact, fairly submitted to the Jury, and unless the evidence were very strongly against their verdict, I should not be disposed to disturb it.
3d. The next ground is one of much more, importance aftd difficulty. There are no questions of more importance, I think none of so much, as *272 those Undef the statutes of limitation. They are statutes of peace and repose, necessary for the comfort of society. They are found in some shape or other in every country, and under every government; their adoption, is scarcely a matter of choice. If the positive enactments of the Legislature do not put a limit to the time within which claims shall be made, that limit re-. Suits from the rules of evidence, and the law presumes that the claim which has been for a great length of time forborne does not exist. Time, with its long train of inevitable and incidental auxiliaries, destroys the muniments of rights, and the evidences of.acquittances, and those statutes, and legal presumptions, which perpetuate their effect, are indispensable. They are great national monuments of right and security; they may sometimes do partial injustice, but without them how much more injustice would be done ? How many titles would be defeated ? nay, how few could be established ? How many incautious persons would be defrauded ? How many estates of deceased persons ruined, by unfounded claims ? The balance is infinite in their favour. It is extraordinary, then, that they should be viewed by jealousy; and by great strictness in their construction, be limitted in their beneficial effects. These statutes have, on one point or other, been continually the subject of judicial doubt and investigation for the last fifteen years in our Courts, and yet, I do verily believe, every *273 point which has been agitated, had been settled, and wisely settled, a century before. The un- ....... happy fact that our judicial decisions are not regularly published, is the great cause of this tuating state of our laws, an evil that I do fervently hope the Legislature will not fail to remedy as soon as possible. I feel confident that the point before us had been settled, by the universal acquiescence of the bench, and the bar, the legislature, and the country, for more than a century. We adopted the policy of the English statutes : they are of force in our statute books; except as they are altered by our own acts. These have made little alteration, except in the periods of limitation. The provisions of the English statutes have been re-enacted almost in their very terms, and we have habitually resorted to the decisions in the English books, on their statutes, for the construction of our own, and they ought to be considered as affording the just, construction of them in reason and principle, unless a manifest difference be shown, not in the unessential letter; but in the context, substance, object, and policy of the law. The decisions in the English books have considered it as a pri,nr ciple pervading the whole of the provisions of their statutes, that when the time begins to run, no supervening disability shall arrest its pro-, gress. Their Courts have declined to discriminate between the different phraseology of the different provisions, or statutes, on the subject. *274 wisely concluding, that, as they were in principie the same, any construction put “ on one woupj equally affect the others.” (Remington, And this conclusion has been pressed upon the Court in the argument of this case. It has been argued, and I think fairly, that, in principle* there is no difference between this case and that of Rose v. Daniel, decided in this Court. I admit it. There may be a verbal difference, but I can see none in 'principle; none in the substance of the several provisions of the act. In that case it was determined, that though the statute had begun to run against the ancestor, upon his death, leaving heirs in minority, it not only ceased to operate, but all its past operation had become a nullity, that it was to begin again, as if the action had then first accrued, and, in effect, that more was to extend to the heir than the ancestor himself, at the time of his death. The effect of that decision will be to deprive this greatly beneficial statute of more than half its usefulness, by depriving it of all its certainty. A different construction was strongly urged by the peculiar circumstances of our country. What may have been merely right in England, became here altogether indispensable and essential. In England there is but a single heir; he is the first born; and, therefore, usually of age at the death of his parent. Here a descent is scarcely cast where infancy does not occur. If the ancestor attain to advanced age, he leaves grand-children *275 who take, and are in a state of infancy, if he die in early life, his own children are in that stale, The inheritance descends on all lineal deseendants. If there are no lineal descendants, thén bn all collaterals — the issue of collaterals who are dead, taking in the place of the parents. I mention these particulars to show how numerous those are who generally inherit, and how very frequent cases of minority must be. Then by another decision of this Court, if a minor be entitled to the smallest portion of the inheritance, though those who are entitled to the rest be of full age, the statute has no operation to any part. Combine the effect of these decisions and what becomes of the object and policy of this great statute? Will it be “a statute of repose,” as it has been happily called ? Of how little value it will be, is well illustrated by the facts of the case of Rose v. Daniel, itself. In that case there had been a possession of upwards of thirty years, with very little interruption, if any; the land had passed from purchaser to purchaser, and no search could have apprised them of the existence of the claim of the plaintiffs, (unless by intuition they could have discovered the existence of the grant under which the plaintiffs claim,) and this forgotton and derelict title turns the vigilant innocent purchaser out of possession, and. sends him for reimbursement, perhaps, to an insolvent or distributed estate. The statute was relied upon, no doubt, as a security against all such *276 dormant claims, but under this construction it is not worth a straw. Enough has been said to furnish my reasons for saying, that I think the principle of Rose v. Daniel is dangerous, and ought not to be extended; and although 1 think that, in fair analogy, the decision in that case ought to gSvern this, yet as it does not bind me as direct and obligatory authority on the point before me, I cannot consent to allow it that influence on my mind. Besides, that decision goes on the ground that the peculiar phraseology of the clause on which it was founded, distinguished it from the other cases of disability for which the statute provides; and although I cannot admit that there is any material distinction even in the Words, yet the ground of the decision serves to relieve me from its authority in this case. I may add, that the words of the act in the clause which relates to this case, are so very plain and explicit as to leave no possible doubt. They are, that if the person shall, at the time of such right of claim of cause of action, given or accrued, be non compos mentis, &c. When, then, did the cause of action in this case accrue ? When the note became due. Was then, the payee, -at that time, non compos mentis ? He was not, and, therefore, clearly the saving of the act does not apply to the case.
The pleadings are not before the Court. If will be observed that the state of them, as. given *277 in the brief, does not present the point argued and decided in relation to the question of disability; the replication is stated to be that the payee was non compos mentis at the time the action accrued. But I have presumed this recital of the pleadings to be a mistake, and only now mention it, that it may not be the ground of misconception hereafter. I am of opinion that the plea of non assumpsit within four years, was a bar to the action, notwithstanding the disability of the payee, as that disability was subsequent to the accruing of the action, and that on that ground a new trial ought to be granted.
Grímké, JVott, and Johnson, 3. concurred.